# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 7, 2013

## BOBBY JACKSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-00127      J. Robert Carter, Jr., Judge**

**No. W2012-01125-CCA-R3-PC  - Filed May 30, 2013**

The petitioner, Bobby Jackson, appeals the denial of his petition for post-conviction relief, arguing that he received ineffective assistance of trial counsel at trial. Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

James A. Greene, Memphis, Tennessee, for the appellant, Bobby Jackson.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Lessie Rainey, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In 2009, the petitioner was convicted of first degree felony murder and especially aggravated robbery and was sentenced to life imprisonment. This court affirmed his convictions on direct appeal, and our supreme court denied his application for permission to appeal. State v. Bobby Jackson, No. W2009-02232-CCA-R3-CD, 2011 WL 1849096, at *1 (Tenn. Crim. App. May 11, 2011), perm. app. denied (Tenn. Sept. 21, 2011).

The underlying facts of the case were recited by this court on direct appeal:

Aurelia Guillen testified that in January 2007, she lived in Memphis, Tennessee, and was separated from the victim, Carlos Guillen, with whom she had two children. She said that the last time she saw the victim was December 31, 2006, when he picked up their children from her house. Guillen testified that the victim owned a Chevrolet Trailblazer.

Jose Leon testified that the Shelby County District Attorney's office employed him as a victim witness coordinator for the Hispanic community. He said that he met Martin Sanchez, a witness in this case, at the preliminary hearing in 2007. At that time, Sanchez gave Leon his local contact information and informed Leon that he planned to return to Mexico. Leon said that Sanchez gave him the number to a phone booth in his village in Mexico. Leon testified that he attempted to locate Sanchez through the local contact information and through the Mexican phone number but was unsuccessful in finding him before trial.

Detective Ronald Goodwin testified that he was a criminal investigator for the Shelby County District Attorney's office. He said that he attempted to locate Sanchez using the information from his statement to police, utility company records, motor vehicle records, and his wife's records. Detective Goodwin said that he went to the local address he found, but no one at that location knew where Sanchez had gone. Detective Goodwin stated that he used a nationwide database to determine whether any agency had arrested Sanchez or his wife, but the search did not reveal any arrests.

On cross-examination, Detective Goodwin testified that he was unaware of whether federal authorities had issued a visa or work permit for Sanchez.

The state played the videotape of Sanchez's testimony from the [petitioner's] preliminary hearing. On direct examination, Sanchez testified that on January 5, 2007, he was in the parking lot of the Willow Oaks Apartments when the victim asked whether he wanted to purchase any CDs. Sanchez said that after he purchased a CD and received change from the victim, two black men approached the victim's vehicle. He said that one man was taller than the other, and the taller man told the victim to get out of the vehicle. The taller man pulled the victim out of the vehicle and pointed a gun at him. The shorter man hit the victim, and the victim fell to the ground. When the victim tried to get up, the taller man shot him. The men drove away in the victim's vehicle. Sanchez testified during cross-examination that he was

twenty meters away from the vehicle and could see and hear everything clearly. He said that police showed him photographs, but he did not identify either of the two suspects from the photographs.

Memphis Police Officer David Reed testified that on January 5, 2007, he responded to a shooting at 2749 Ketchum Road in the Willow Oaks apartment complex. When he arrived, he found a male Hispanic laying on the ground. Officer Reed testified that he took witness reports and held the scene until detectives arrived.

Memphis Police Sergeant Alisa Mitchell testified that in January 2007, she was a crime scene investigator. She said that on January 5, 2007, she made the scene at 2749 Ketchum Road and observed that the victim was lying on his back with his arms above his head. She recalled that he had a gunshot wound to the chest. Sergeant Mitchell testified that she photographed the scene and collected three nine millimeter Luger Winchester shell casings.

On cross-examination, Sergeant Mitchell testified that the victim was carrying a wallet with $44 inside. She said that she collected the wallet as part of the victim's personal belongings.

On re-direct examination, Sergeant Mitchell testified that she did not recover the victim's keys at the scene.

Tracy Rivers testified that she lived in the Willow Oaks apartment complex. She said that on January 5, 2007, she was walking through the apartment complex with her fourteen-year-old cousin when two young black males tried to speak to her cousin. Rivers said that she had never seen the males before that day. She stated that the males were between sixteen and nineteen years old and that one was taller than the other. Rivers testified that she had just walked into her apartment approximately five minutes after encountering the males when she heard three gunshots. Rivers said that she looked out of the door and saw a "bluish greenish truck speed out." She also described the vehicle as a jeep.

On cross-examination, Rivers testified that she was unable to identify the two males in a photospread shown to her by police on January 7, 2007.

Memphis Police Officer Randall Davis testified that on January 6, 2007, he was patrolling his precinct when he observed a blue Chevrolet SUV

parked in the driveway of an empty house. He ran the vehicle identification number on his computer, which indicated that the vehicle was stolen. Officer Davis recalled that a white cross was hanging from the rearview mirror. He said that the police department towed the vehicle to the investigative hold unit. The parties stipulated that the 2002 Chevrolet Trailblazer was registered to the victim.

Varreous Thomas testified that he was the co-defendant's brother. He said that on January 5, 2007, he was with the defendant at the Hillview Apartments, and he heard the defendant say that he had shot someone. Thomas stated that he saw a blue Chevrolet Trailblazer that day on Alcy Road behind an abandoned house, which was a five minute walk from the Hillview Apartments. He said that he had not seen the defendant with that vehicle before that day. Thomas agreed that he told police that the defendant had some keys that Thomas believed were for the Trailblazer, but he said that he was "under pressure" when he said that.

On cross-examination, Thomas testified that the defendant never told him anything about a Trailblazer.

Officer Vivian Massey testified that she was a corrections officer at 201 Poplar Avenue. She said that on June 9, 2009, Officer Tyrone Mourning gave her a letter, which she in turn gave to her lieutenant. She recognized Exhibit 22 as the letter that Officer Mourning gave her.

Officer Mourning testified that he was a corrections officer at 201 Poplar Avenue. He said that on June 9, 2009, the defendant gave him a letter, which he identified as Exhibit 22, to give to David Hamilton, the co-defendant. Officer Mourning stated that he gave the letter to Officer Massey.

The state read the letter into evidence, paraphrasing at times. The full letter read as follows:

> What's up lil bro. You straight down their [sic]. [L]ook I been hearing you suppost [sic] to be testyfying [sic] against me. Why you wanna do that bro. So you want me to spend the rest of my life [in] jail from my 3 kids. You know I [expletive] with you bro like a lil brother but why you want to get both of our life [sic] [expletive] off. Cause both of us gone do some time

regardless. We were together lil Dave bro. [T]he reason they want you to testyfied [sic] is because they don't have the shooter[.] [I]f they don't got [sic] that[,] they don't have [expletive] on us[,] meaning they don't got [sic] no case. Why you think we been [sic] here so long bro. [I]f you don't testyfied [sic] we go home. [Expletive] you said you ready [sic] to go home right. Well let's make this [expletive] happen. You need to get in that law work bro [and] stop fighting [expletive] cause that type of [expletive] make you look bad in court. I go to trial July 6. I don't want you to testyfied [sic] against me bro, cause I want to go home to [sic]. We both need our freedom. [T]hen look if both of us get charge[d] it's gone [sic] get broke down to [i]nvoluntary manslaughter. [I]f you look in your law work you will see that [i]nvoluntary manslaughter is a homicide committed under such circumstances that it plainly appears that neither death nor bodily harm was intended by the party doing the killing, but that death was accidentally caused by some unlawful act, or by some act not strictly unlawful in itself, but done in an unlawful manner and without due caution and that death was natural and probable result of such act. So [r]emember I told them that we got into a fight of the gun [and] it went off[,] but at the same time we tried to robb [sic] that man to [sic]. So we still gone [sic] have to do some time bro. So are you shure [sic] you want to testyfied [sic]. [I]f so you must gone [sic] take the Especially [sic] Aggravated robbery. [N]ow that goes back when I said we were together[.] I can't take both of the charges bro real talk. We need to fight this [expletive] together. Once again[,] no shooter, no case, don't never [sic] forget that bro. [I]f you don't listen to [nobody] else listen to me because I'm reading on this [expletive]. Don't testyfied [sic] lil Dave. I love you bro. [R]eal talk even though I talk bad about you[,] but I still [expletive] with you because you my young [expletive] [and] you don't understand this [expletive]. [B]ut we can beat these people.

[Signed] Murder Man A.K.A. get down or laydown B.K.A. lil Bobby To lil Dave

On cross-examination, Officer Mourning stated that he did not recall the exact date in June when the defendant gave him the letter nor what time

of day it was. He said that he was not familiar with the defendant's handwriting and did not see the defendant write the letter. He agreed that the defendant had a cell mate.

Francis Donald Carpenter testified that he was retired from the Memphis Police Department, where he was a crime scene and fingerprint technician. He testified that he processed fingerprints from a coffee cup found inside the victim's vehicle and from the vehicle itself. The parties stipulated that the fingerprints matched the victim's.

Tennessee Bureau of Investigation Special Agent Cervinia Braswell testified that she was a forensic scientist in the firearms identification unit. She said that the Memphis Police Department provided her with a bullet, three nine millimeter cartridge cases, a box of Winchester .380 caliber ammunition, a Cobra .380 automatic pistol, and seven other Winchester .380 caliber cartridges. Agent Braswell testified that the three nine millimeter cartridges were fired from the same weapon. She said that the .380 pistol would not have been able to fire nine millimeter bullets. Agent Braswell said that the bullet provided to her was a nine millimeter.

Memphis Police Sergeant Anthony Mullins testified that he interviewed Varreous Thomas in connection with this case. According to Sergeant Mullins, the robbery bureau was interviewing Thomas about several cases when he indicated that he had information about a homicide. Thomas agreed to speak with homicide detectives and gave a witness statement. Sergeant Mullins said that Thomas told him that the defendant had told him that he shot the victim after Thomas saw a blue Trailblazer on Alcy Road. Thomas identified a picture of the victim's Trailblazer as the vehicle he saw. Thomas told him that he went to the Trailblazer with Jeffrey Turner, who took some CDs out of the vehicle. Thomas said that the defendant had a set of keys with "a little thing hanging on them" that had "Mexican words" written on it. Thomas assumed the keys belonged to the Trailblazer because the vehicle's steering column was not broken and because the defendant did not own a vehicle.

Sergeant Mullins further testified that he interviewed the defendant on February 12, 2007, because Thomas'[] statement and another witness's statement implicated the defendant. In the defendant's written statement, the defendant admitted that he was responsible for the victim's death. He said that he fired one or two shots from a nine millimeter. The defendant said that

"Dave" was with him and was armed with a .22 caliber weapon but did not fire any shots. The defendant stated that he shot the victim because the victim tried to take his gun. The defendant said that he got the nine millimeter from a person named Octavious, and he returned the gun to Octavious after shooting the victim. He said that Dave drove the Trailblazer away from the scene, and the defendant later drove it to a location near his house on Sugar Creek Road. Sergeant Mullins testified that, at the time that the police booked the defendant and his co-defendant into the jail, the defendant was two inches taller and fifty pounds heavier than his co-defendant.

On cross-examination, Sergeant Mullins testified that Thomas initially told him that the defendant did not tell him anything about his involvement. He further testified that he knew that the defendant was a juvenile at the time of his interview and that his mother was in Memphis. He agreed that he did not contact the defendant's mother. Sergeant Mullins said that the defendant indicated that he had completed the tenth grade and had been in special education classes. Sergeant Mullins stated that the defendant initially did not understand his rights, so Sergeant Mullins and his partner "went over each of his rights with him."

On re-direct examination, Sergeant Mullins testified that the defendant was in custody in the Shelby County Jail rather than in the juvenile system; therefore, he treated the defendant as an adult. Sergeant Mullins said, "[A]pparently he had been involved in so many encounters with the law that the juvenile system felt there was nothing they could do to rehabilitate him or anything else."

Dr. Lisa Funte, an assistant medical examiner, testified that the victim died from a gunshot wound to his chest. She further testified that stippling around the entrance wound indicated that the muzzle of the gun was "within a few inches to a few feet."

Id. at *1-5.

In December 2011, the petitioner filed a *pro se* petition for post-conviction relief, in which he raised, among other things, various allegations of ineffective assistance of counsel. Counsel was appointed, and an amended petition was filed on March 2, 2012. The post-conviction court conducted an evidentiary hearing on April 5, 2012.

At the hearing, the petitioner testified that he was seventeen years old and on

probation at the time of the instant offenses. He said that he was incarcerated for a new aggravated robbery charge when he was interviewed by homicide detectives on February 12 or 13, 2007, for the instant case. He admitted that he denied "about three or four times" any knowledge of the victim's murder. Asked if he requested an attorney during the interview, the petitioner said, "I didn't know what I needed at that time because my mind wasn't right at that moment." He admitted that he told the detectives he had tried to rob the victim of his car and that the victim was accidentally shot during the ensuing struggle. He further admitted that the statement was in his handwriting, but he could not remember if he signed it.

The petitioner said that he was placed in special resource classes as a child and that he had been diagnosed with mild retardation. He could not recall if he gave this information to the detectives during his interview. He said he was placed on suicide prevention while awaiting trial because he attempted to hang himself and had cut his arm and wrists with a razor. He recalled going to a mental health institution after being released from the hospital. He had been prescribed two medications but was not currently taking them.

The petitioner said he asked trial counsel about trying to suppress his statement, but counsel said it would be denied or would not help. He said that trial counsel met with him at the jail one time and sent co-counsel most of the time. He said that the "man that they said that was on video tape" should have been called as a witness at trial. The petitioner said that he felt "like . . . [he] could of got a deal in there. I feel like – because my charge partner, I'm trying to see how I end up getting all this time and my charge partner got thirty-five years but I got life plus twenty." He said trial counsel told him he had "a no deal case."

During examination by the post-conviction court, the petitioner said he told trial counsel everything he knew about the case. He acknowledged that his life sentence and twenty-year sentence were concurrent. He said he was sentenced to three years for the aggravated robbery charge. He maintained that he was "just trying to carjack" the victim, but the victim fought back and got shot.

Trial counsel, who had tried approximately thirty cases and represented other clients charged with first degree murder, testified that he was appointed to represent the petitioner in August 2007 and also represented the petitioner on an aggravated robbery case. Another attorney, who had ten years experience, was also appointed for the petitioner. Trial counsel represented the petitioner until August or September 2009 but could not recall how many times he met with the petitioner. However, his investigator met with the petitioner regularly. Counsel did not think co-counsel met with the petitioner but said she resembled the investigator, which may have caused the petitioner's confusion about who met with him.

Trial counsel said he did not file a motion to suppress the petitioner's statement because he litigated the petitioner's statement as to the aggravated robbery charge and realized how futile suppressing his statement would be because the petitioner had a lengthy criminal history and his statement was largely "self-serving." Counsel said that a few days before trial, the petitioner sent a letter, which he signed as "murder man," to his co-defendant in the jail. Counsel filed a motion to suppress the letter, but it was denied. Counsel said the petitioner was evaluated at Midtown Mental Health Institute and found to be competent to stand trial.

On May 3, 2012, the post-conviction court entered an order denying post-conviction relief, and this appeal followed.

## ANALYSIS

The petitioner argues that he received the ineffective assistance of trial counsel because counsel failed to suppress his statement or object to the admission of the letter he signed as "murder man" and sent to his co-defendant. The State responds that the petitioner has failed to meet his burden of proof as to his claims. We agree with the State.

Post-conviction relief is available to a petitioner who establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the post-conviction court "are entitled to substantial deference on appeal unless the evidence preponderates against those findings." Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001); see also Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review is of purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields, 40 S.W.3d at 458; Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Ordinarily, to establish that he was denied the effective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v.

Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

The prejudice prong of the Strickland test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

In its order denying the petition for post-conviction relief, the court found that trial counsel's decision to not seek suppression of the petitioner's statement was a "valid tactical decision" in view of the petitioner's record and the fact that the statement was largely self-serving, as testified to by trial counsel. The court noted that trial counsel unsuccessfully

litigated the letter the petitioner sent to his co-defendant. The court also noted that, at the evidentiary hearing, post-conviction counsel and trial counsel agreed that trial counsel "had very little to work with." The court concluded:

> Petitioner has failed to prove that his trial attorney was deficient. Trial counsel was fully prepared and argued [the] [p]etitioner's case as well as he could. Petitioner still does not see how the shooting death of an individual during the course of stealing the individual's vehicle can be a murder.
>
> Counsel was able to persuade the trial judge to order concurrent sentences. Petitioner simply has not put forth any evidence of what his attorney should have done beyond that which was done."

The record fully supports the post-conviction court's findings that the petitioner received effective assistance of counsel. Trial counsel testified that he did not file a motion to suppress the petitioner's statement because the petitioner had a lengthy criminal history, including another aggravated robbery conviction, and the statement was largely "self-serving," which would allow the petitioner to get his version of the facts to the jury without exposing him to cross-examination. Counsel's decision to not seek suppression of the petitioner's statement was a tactical decision we will not second-guess on appeal. We cannot conclude that counsel performed deficiently. With regard to the letter the petitioner sent to his co-defendant, counsel testified that he filed a motion to suppress the letter, but it was denied. The petitioner now insinuates that counsel should have sought redaction of portions of the letter. However, we cannot conclude that counsel's acts or omissions fell below an objective standard of reasonableness, given that counsel sought suppression of the letter but was unsuccessful.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE